**ORDERED.**

**Dated:  May 22, 2025**

Tiffany P. Geyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

Commercial Express, Inc.,                                   Case No. 6:23-bk-1333-TPG
                                                            Chapter 7

                        Debtor.

_____/

**MEMORANDUM OPINION ON MOTIONS
TO APPROVE SALE AGREEMENT AND RELATED
<u>SETTLEMENT AGREEMENT CONTINGENT UPON ENTRY OF BAR ORDERS</u>**

The issue before the Court is whether the United States Supreme Court decision in

*Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024),

precludes the Court from approving a Chapter 7 Trustee's sale of an insurance policy and a

related settlement agreement when both are contingent upon the entry of third-party bar orders.

The parties advocating for approval of the bar orders argue that 11 U.S.C. § 105(a) coupled with

the Eleventh Circuit's decision in *Matter of Munford, Inc.*, 97 F.3d 449 (11th Cir. 1996), 11

U.S.C. § 363(f), 28 U.S.C. § 1334, and Rules[1] 6004 and 9019 supply the Court with the authority

to approve the bar orders as necessary to the sale and settlements. The United States Trustee (the

---

[1] Unless otherwise specified, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§
101–1532 (the "Code"), all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all
"Civil Rule" references are to the Federal Rules of Civil Procedure.

"UST"), however, argues that *Purdue* implicitly overruled *Munford* and that therefore the settlement and sale, due to the bar order requirements, which the UST characterizes as nonconsensual, cannot be approved. For the reasons explained herein, the Court concludes the sale, settlements, and bar orders can and should be approved.

## I.    SUMMARY OF THE INSTANT CASE, *MUNFORD*, AND *PURDUE*

The matters before the Court arise from the parties' attempts to settle their disputes resulting from a tragic trucking accident. Their agreements implicate the law regarding bar orders pursuant to *Munford* and whether that law has been implicitly overruled by *Purdue*.

### A.   Summary of this Chapter 7 Case.

The Debtor filed this Chapter 7 case on April 11, 2023, approximately one year after a trucking accident in Alabama that resulted in serious personal injuries to multiple victims and the death of a child. (Doc. No. 1; Doc. No. 129 at 15.) Mr. Arvind Mahendru was appointed as the Chapter 7 Trustee to administer the Debtor's estate (the "Estate"). Prepetition, the accident victims (or their families or other representatives) (collectively, the "Accident Plaintiffs") sued the Debtor and others in three federal district court actions in Alabama (the "Alabama Actions"),[2] each alleging the Debtor was at fault for the accident. (Doc. No. 129 at 2.) Suggestions of bankruptcy were filed in two of the three Alabama Actions.[3]

---

[2] *Desmond Bradley, et al. v. Big's Trucking, et al.*, Case No. 2:23-cv-00122-MHT-JTA (M.D. Ala.); *Charasma Moseley, et al. v. Big's Trucking, et al.*, Case No. 2:23-cv-00262-MHT-JTA (M.D. Ala.); *Lauren Moseley v. Christopher Ivan Harris, et al.*, Case No. 2:23-cv-00683-CWB (M.D. Ala.).
[3] *Desmond Bradley, et al. v. Big's Trucking, et al.*, Case No. 2:23-cv-00122-MHT-JTA (M.D. Ala.) (Plaintiffs' Status and Notice of Pending Bankruptcy, Doc. No. 20, filed on September 27, 2023); *Charasma Moseley, et al. v. Big's Trucking, et al.*, Case No. 2:23-cv-00262-MHT-JTA (M.D. Ala.) (the Debtor filed a Suggestion of Bankruptcy, Doc. No. 10, on May 10, 2023).

The Accident Plaintiffs timely filed proofs of claims totaling over $24 million.[4] (Doc. No. 169 ¶ 5.) The Debtor valued its assets at $26,000 (Doc. No. 8 at 6), so the best source of recovery for the Accident Plaintiffs was the Debtor's insurance policies. The relevant policies are with Progressive Express Insurance Company ("Progressive") and Fortegra Specialty Insurance Company ("Fortegra"). (Doc. No. 169 ¶¶ 6, 9.) Recovery under either policy, however, is far from certain.

The insurance coverage issues are highly contested. Greatly simplified, Progressive and Fortegra argue they are not obligated to defend or indemnify the Debtor for the accident.[5] (Doc. No. 196 ¶¶ 10, 11.) On July 26, 2023, Fortegra sued the Chapter 7 Trustee, as Estate representative, and each of the Accident Plaintiffs in adversary proceeding 6:23-ap-81-TPG, seeking a declaratory judgment that it has no duty to defend or indemnify the Debtor (the "Fortegra Adversary"). (Adv. Pro. No. 6:23-ap-81-TPG, Doc. No. 1.) The Accident Plaintiffs and the Chapter 7 Trustee filed answers to Fortegra's First Amended Complaint. (Adv. Pro. No. 6:23-ap-81-TPG, Doc. Nos. 58, 59, 60.) The Accident Plaintiffs ultimately sought derivative standing to pursue the Debtor's claims against Fortegra and Progressive for coverage related to the accident. (Doc. Nos. 95, 96.) Progressive, which was defending the Debtor in the Alabama Actions under a reservation of rights (Doc. No. 196 ¶¶ 4, 11), maintained it would seek to join in

---

[4] Charasma Moseley and Lauren Moseley filed claims for $4 million each (Claims 55-1, 56-1); the Estate of Karmyn Amaris Hope Moseley filed a claim for $8 million (Claim 57-2); Andrea Thomas, Desmond Bradley, Paul Craig Harris, Tracy Powell, and minors A.B. and C.B. filed claims for $250,000.00 each (Claims 59-1, 60-1, 62-1, 63-1, 64-1, 65-1); and Brian Buerkle filed a claim for $5 million (Claim 61-1).
[5] Fortegra asserts that there is no duty to defend and no indemnification coverage because the Debtor failed to comply with the Special Conditions Endorsement by permitting the driver that caused the accident to operate the truck without proof that the driver had an automobile insurance policy in full force and effect providing liability coverage of at least $300,000 arising out of the driver's use of the truck. (Adv. Pro. No. 6:23-ap-00081-TPG, Doc. No. 49 ¶¶ 56, 64.) Fortegra also asserts that its policy does not provide indemnification for punitive damages. (Adv. Pro. No. 6:23-ap-00081-TPG, Doc. No. 49 ¶ 73.)

the Fortegra Adversary or file its own adversary proceeding against the Debtor's Estate, absent

settlement (Doc. No. 129 ¶ 6).

      1.   The Estate and the Accident Plaintiffs settle.

On March 26, 2024, the Chapter 7 Trustee filed the first of two settlement motions

pursuant to Rule 9019, this one between the Estate and the Accident Plaintiffs (the "Estate

Settlement"). (Doc. No. 100.) The Estate Settlement previewed that the Chapter 7 Trustee and

the Accident Plaintiffs also reached a settlement with Progressive that would be the subject of a

second Rule 9019 motion. (*Id.* at 9.) The Estate Settlement was intertwined with the

contemplated settlement with Progressive as the Estate Settlement contained an agreement

between the Chapter 7 Trustee and the Accident Plaintiffs as to the division of proceeds from the

Progressive policy. (*Id.*) The Estate agreed to convey to the Accident Plaintiffs all interests in

any insurance policy of the Debtor connected to the accident (*id.* § 2(a)), and the Accident

Plaintiffs would waive any right to payment on their claims from the Estate (*id.* at 10, § 2(b)(iii)).

In exchange, the Estate would receive a sum certain from the settlement amount paid by

Progressive, and a percentage from Fortegra or other insurers of the Debtor. (*Id.* at 9-10, § 2(b)(i)

– (iii)). The Estate Settlement was appropriately noticed (Doc. Nos. 102, 104) and drew no

objections.

      2.   The Estate, the Accident Plaintiffs, and Progressive reach a settlement, contingent
          upon Court approval of a bar order in favor of Progressive.

Several months later, on August 20, 2024, the Accident Plaintiffs, Progressive, and the

Chapter 7 Trustee filed the anticipated second settlement motion pursuant to Rule 9019 which

was contingent upon the Court's entry of a bar order protecting Progressive from future claims

concerning the accident (the "Progressive Settlement") (Doc. No. 129), and attaching a Pro

Tanto Release (the "Release") (Doc. No. 129 at 13-28) and a proposed bar order (*id.* at 30-32).

The Progressive Settlement provided that, in exchange for a bar order, Progressive would pay $400,000 under an MCS-90 endorsement which, according to the Chapter 7 Trustee, represented the Estate's "best day" due to the differences in how courts treat MCS-90 endorsements.[6] (*Id.* ¶¶ 16, 22.) Progressive agreed to waive any right to reimbursement from the Estate, including for any costs defending the Debtor. (*Id.* ¶ 22.) "[W]ithout the bar order to protect Progressive . . . Progressive would not pay the substantial sum of $400,000" and simply join the Fortegra Adversary Proceeding and fight any payment under the MCS-90 endorsement. (*Id.* ¶ 23.) As such, the bar order in favor of Progressive was a critical and necessary component of the settlement, absent which Progressive would refuse to pay anything to the Estate and continue to dispute coverage.

The proposed bar order and Release are limited to liability for the accident. (*Id.* at 17, 18.) The Release was executed by each of the Accident Plaintiffs, Progressive, and the Chapter 7 Trustee and reflects the intent of the Accident Plaintiffs and the Chapter 7 Trustee to extinguish all claims against Progressive concerning the accident, while reserving and preserving claims against other defendants in the Underlying Actions, including Fortegra. (*Id.* at 13-28.) The requested bar order would enjoin Fortegra and all other insurers, persons, or entities from seeking recovery from Progressive in connection with the accident. (*Id.* at 31, ¶ 3.) Subsequently,

---

[6] According to the Chapter 7 Trustee, an MCS-90 endorsement offers coverage of an uncertain scope. (Doc. No. 129 at 7.) The Trustee states that "most courts find [an MCS-90 endorsement to create] a surety relationship and if there is recovery from any other source of at least $750,000, there is no longer any surety obligation under the MCS[-]90." (*Id.* at 7 (citing *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 888 (10th Cir. 2009))). An MCS-90 endorsement establishes proof of the minimum insurance requirement imposed by The Motor Carrier Act of 1980 "on each motor carrier registered to engage in interstate commerce." *Nat'l Specialty Ins. Co. v. Martin-Vegue*, 644 F. App'x 900, 906 (11th Cir. 2016). The surety obligation is only triggered when the insurance policy to which the endorsement is attached does not provide liability coverage for the accident and the motor carrier's other insurance coverage fails to meet the $750,000 federally mandated minimum or does not exist. *Id.* at 906-07. "If a motor carrier's insurance pays a judgment satisfying the regulatory minimum, the goal of public financial responsibility has been accomplished and the endorsement does not apply." *Id.* at 907.

Progressive agreed it would not pursue any claims against those barred from pursuing it. (Doc. No. 162 ¶ 1.)

       3.   Fortegra and the UST object to the bar order in the Progressive Settlement.

Fortegra objected to the Progressive Settlement, arguing that "the Court's ability to issue a Bar Order is in serious doubt" following *Purdue* (Doc. No. 146 ¶ 11), and that the proposed bar order in Progressive's favor was not fair and equitable under the considerations set forth in *Munford* (*id.* at 4-7). On October 29, 2024, the UST also objected[7] to the proposed bar order because it would apply to third parties who did not participate in settlement negotiations, "including Ace Property and Casualty Insurance Company, Trisure Specialty Insurance Company, Kinsdale Insurance Company, [and] United National Insurance Company . . . (collectively, the "Barred Third Parties")." (Doc. No. 160 ¶ 9.) The UST argues this amounts to a nonconsensual bar order precluded by *Purdue*, which the UST asserts "undermine[d] *Munford* to the point of abrogation." (*Id.*)

       4.   The Barred Third Parties were served with two notices of the Progressive Settlement and proposed bar order, the objection deadline, and hearing dates, and none objected to the Progressive Settlement.

The Chapter 7 Trustee served each of the Barred Third Parties (as defined by the UST) with the motion seeking approval of the Progressive Settlement.[8] Additionally, the Barred Third Parties (among others) were served with the related notice of hearing for September 4, 2024. (Doc. No. 131 at 3-4.) At that hearing, and expressly because the Progressive Settlement required a bar order, the Court directed the Chapter 7 Trustee to re-notice the hearing, prominently setting

---

[7] The UST requested and was granted the opportunity to file a position statement. (Doc. No. 155.) The United States Trustee "may raise and may appear and be heard on any issue in any case or proceeding" brought under the Code. 11 U.S.C. § 307.

[8] Doc. No. 130 at 2-3 (reflecting service upon Fortegra, Ace Property and Casualty Insurance Company, Kinsdale Insurance Company, United National Insurance Company, and Trisure Specialty Insurance Company, among others).

forth the request for a bar order and establishing a later objection deadline. (Doc. No. 141.) The

Chapter 7 Trustee complied (Doc. No. 140), and the hearing was reset for November 20, 2024, at

which time the Court would evaluate the parties' evidence and arguments on whether the

Progressive Settlement met the factors set forth in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544

(11th Cir. 1990), and whether the bar order was fair and equitable, per *Munford*. (Doc. No. 140.)

Other than Fortegra, none of the Barred Third Parties filed an objection to the Progressive

Settlement and proposed bar order, despite a second opportunity to do so.[9]

     5.   The parties agree to a judicial settlement conference.

By the time of the hearing on the Progressive Settlement, the parties had narrowed any

factual disputes, stipulating to certain facts and conditions (Doc. Nos. 162, 168, 169),[10] generally

obviating any need for a lengthy contested hearing. But with the Fortegra and UST objections

(Doc. Nos. 146, 160) still pending and looming uncertainty concerning third-party bar orders

following *Purdue,* the Chapter 7 Trustee requested and received an order directing the parties to

participate in a judicial settlement conference ("JSC") with another judge from the Middle

District of Florida, the Honorable Jacob A. Brown. (Doc. Nos. 173, 175.)

The JSC proved productive and aided in narrowing the issues before the Court even

further. The parties resolved all issues in the Fortegra Adversary and Fortegra's objection to the

---

[9] On September 5, 2024, the Chapter 7 Trustee filed a "Notice of Continued Hearing," notifying the Barred Third Parties of the continued hearing on the Progressive Settlement, that the Progressive Settlement contains a bar order, and that any objections must be filed by September 13, 2024. (Doc. No. 140 at 1.) Pursuant to Local Rule 2002-4 which supplies applicable negative notice procedures, the notice informed the parties that if a response was not filed by the deadline, the Court may conclude that there is no opposition to the motion. (*Id.*)

[10] Importantly, Progressive stipulated to waive any claim it may have against the Barred Third Parties related to the accident. (Doc. No. 162 ¶ 1.) The Chapter 7 Trustee and Fortegra stipulated, among other things, that Fortegra's interest under the Progressive Policy is in bona fide dispute (Doc. No. 164 ¶ 12), that the Progressive Settlement would not occur absent a bar order (*id.* ¶ 14), and that Fortegra and Progressive each incurred costs and fees defending the Debtor related to the accident (*id.* ¶¶ 8, 10).

Progressive Settlement. (Doc. No. 180.) In addition, the Debtor and Fortegra agreed Fortegra would buy its policy back from the Estate conditioned, like the Progressive Settlement, upon a bar order. (Doc. No. 182 at 1.)

On January 31, 2025, the Chapter 7 Trustee filed a motion asking the Court to approve the sale pursuant to Rules 6004 and 9019, and §§ 105(a) and 363(f), with a bar order enjoining claims against Fortegra (the "Fortegra Sale Motion"). (Doc. No. 182.) In exchange for the bar order and in settlement of the Fortegra Adversary, Fortegra would purchase its policy from the Estate for $590,000 free and clear of any claims and interests. (Doc. No. 182-1 at 2-3.) Like the bar order requested by Progressive, the bar order in favor of Fortegra was also limited to claims related to the accident and applicable policy. (Doc. No. 182-2.)[11] From the $590,000, the Estate would retain $25,000 plus $15,000 in the event of an appeal, with the balance, $550,000, paid to the Accident Plaintiffs. (Doc. No. 182-1 at 4.) In addition, Fortegra agreed to release any claim it may have against the Estate, the Accident Plaintiffs, Progressive, and any other person subject to the bar order (the "Barred Third Parties"). (Doc. No. 182 ¶ 13.) Finally, the parties agreed that if the Fortegra Sale Motion is approved, the Accident Plaintiffs would each have allowed claims in reduced amounts with no promise of a distribution from the Estate (Doc. No. 182-1 at 4), which agreement benefits the Debtor's other general unsecured creditors.

In sum, all issues among the Chapter 7 Trustee, the Accident Plaintiffs, Progressive, and Fortegra were resolved pending the Court's approval of the requested bar orders.[12] Only the

---

[11] The relevant bar order language requested an "injunction prohibiting any person or entity, including but not limited to any claims or potential claims of the following individuals or entities from seeking any type of recovery from Fortegra under the Fortegra Policy in connection with or arising from the Accident or the [Alabama] Actions" and lists the Barred Third Parties, the parties to the Alabama Actions, and "[a]ny other insurer affording liability coverage to the Underlying Defendants [in the Alabama Actions] or first-party coverage to the [Accident] Plaintiffs in connection with the Accident." (Doc. No. 182-1 at 2-3.)

[12] The Chapter 7 Trustee and the Accident Plaintiffs agreed that the settlement agreement with Fortegra would supersede and replace the Estate Settlement. (Doc. No. 182-1 at 2.)

UST's objections remain unresolved. But the Chapter 7 Trustee and the UST filed a joint stipulation (Doc. No. 196) relating to the Progressive Agreement and the Fortegra Sale Motion in which the UST stipulated that it did not question the Chapter 7 Trustee's business judgment and agreed that the *Justice Oaks*[13] factors were satisfied. (Doc. No. 196 ¶ 19.) In addition, the parties stipulated that both insurance policies constitute property of the estate, that a bona fide dispute exists as to insurance coverage, that the proposed sale of the Fortegra policy is in good faith, and that any parties claiming interests in the Progressive policy or the Fortegra policy could be compelled to accept a money satisfaction of such interests. (*Id.* ¶¶ 21, 22, 23, 36.) As such, the parties agreed that the required elements for a free and clear sale set forth in § 363(f)(4) and (5) are met and that the good faith protections in § 363(m) should apply.

On February 26, 2025, the Court conducted a hearing on the Fortegra Sale Motion and to consider any remaining issues regarding the Progressive Settlement. (Doc. No. 198.) The Chapter 7 Trustee's exhibits were admitted without objection and the Court took judicial notice of the docket entries in this case and in the Fortegra Adversary. (*Id.*) Because the parties supplied factual stipulations supporting each applicable statutory requirement and following the Court's independent evaluation of the same, in addition to the absence of any objection by the Barred Third Parties, the Court granted the Fortegra Sale Motion and approved the Progressive Settlement with bar orders, overruling the UST's objections. (Doc. No. 203.)

---

[13] In *In re Justice Oaks II, Ltd.*, 898 F.2d at 1549, the Eleventh Circuit identified the four factors a bankruptcy court must consider when evaluating a compromise: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

6. The UST's objections to the bar orders in the instant case.

To be clear, the UST did not object to the Progressive Settlement (Doc. No. 160) or the Fortegra Sale Motion (Doc. No. 195) in principle, only to the third-party bar orders which it deems nonconsensual (though there is no evidence of this), and that *Purdue* forecloses nonconsensual injunctive relief as a matter of law. The UST also argues that because *Munford* relied only on § 105(a) and a procedural rule to approve a bar order, it was implicitly abrogated by *Purdue*. (Doc. No. 160 ¶ 26; Doc. No. 195 ¶¶ 18, 19, 22, 23.) Further, the UST argues that because not even the debtor will receive a discharge in this corporate Chapter 7 case, the Chapter 7 Trustee must "point to some Code provision that permits chapter 7 debtors, but not chapter 11 debtors, to impose nonconsensual releases of claims between non-debtors." (Doc. No. 160 ¶ 22).

B. *Munford*

Evaluating the merits of the UST's arguments and any potential impact of *Purdue* on *Munford* and on the instant case requires an analysis of *Munford* and *Purdue*. In *Munford*, a Chapter 11 debtor filed an adversary proceeding asserting claims against multiple defendants regarding an unsuccessful leverage buy out, which the debtor blamed for its insolvency. *Munford*, 97 F.3d at 452. Liability was contested, but one defendant offered to settle for a sum certain (the "Settling Defendant"), conditioned "upon the bankruptcy court's issuance of a protective order permanently enjoining [other defendants who had not settled (the "Non-settling Defendants")] from pursuing contribution or indemnity claims against it." *Id.* The Debtor sought approval of the settlement under Rule 9019(a), and the bankruptcy court entered an order approving the settlement and permanently enjoining the Non-settling Defendants from asserting

claims against the Settling Defendant pursuant to Civil Rule 16[14] and §105(a), which the district court affirmed. *Id.*

In *Munford*, unlike here,[15] the bankruptcy court's subject matter jurisdiction to grant injunctive relief concerning unasserted state law contribution and indemnity claims held by third parties was challenged, *id*. at 453, and much of the Eleventh Circuit's discussion in *Munford* focused on this issue. Because a bankruptcy court's "related to" jurisdiction supplied by 28 U.S.C. § 1334 extends to any controversy having a conceivable impact upon a bankruptcy estate, the bankruptcy court had subject matter jurisdiction to grant injunctive relief. *Id*. at 453 (citing *Miller v. Kemira, Inc. (Matter of Lemco Gypsum, Inc.)*, 910 F.2d 784, 787-88 (11th Cir. 1990)); *see also Celotex Corp. v. Edwards,* 514 U.S. 300, 307 n.5, 115 S. Ct. 1493, 1498 n.5, 131 L. Ed. 2d 403 (1995) (bankruptcy courts have "related to" jurisdiction over suits "between third parties which have an effect on the bankruptcy estate.").

After analyzing *if* a bankruptcy court could enter a bar order against the Non-settling Defendants and concluding it could by virtue of 28 U.S.C. § 1334, the Eleventh Circuit then determined *when*, or in what context, a bankruptcy court may do so. *Munford*, 97 F.3d at 455. When a bankruptcy court makes a "reasoned determination" that a bar order is integral and necessary to a settlement, and fair and equitable to the parties affected by the bar order, it can approve a bar order. *Id.* In *Munford*, the Eleventh Circuit affirmed the District Court's decision affirming the bankruptcy court's bar order, concluding that § 105(a) and Rule 16 taken together

---

[14] Civil Rule 16(c)(9) has since been renumbered to Civil Rule 16(c)(2)(I) and is incorporated in adversary proceedings as Rule 7016. Civil Rule 16(c)(2)(I) relevantly provides that "[a]t any pretrial conference, the court may consider and take appropriate action on settling the case and using special procedures to assist in resolving the dispute when authorized by statute or local rule . . . ." Fed. R. Civ. P. 16(c)(2)(I) .

[15] The UST did not argue that the bankruptcy court lacks subject matter jurisdiction to enter the bar orders requested.

authorize bankruptcy courts to enter bar orders when integral to a settlement in an adversary proceeding. *Id.* at 455-56.

C. *Purdue*

The facts in *Munford* and *Purdue* are not like the facts here. In *Purdue*, the proposed claims to be barred arose from opioid addictions, constituting "'one of the largest public health crises in this nation's history,'" *Purdue*, 603 U.S. at 209, 144 S. Ct. at 2078, 219 L. Ed. 2d 721 (quoting *In re Purdue Pharma L. P.*, 69 F.4th 45, 56 (2nd Cir. 2023), estimated by the Department of Health and Human services to cost the country between $53 and $72 billion annually. *Id.* (citing *In re Purdue Pharma L. P.*, 635 B.R. 26, 44 (S.D.N.Y. 2021)). "Between 1999 and 2019, approximately 247,000 people in the United States died from prescription-opioid overdoses." *Id.* The Sackler family, which owned and controlled Purdue, was at the center of responsibility for this crisis. 603 U.S. at 209-10, 144 S. Ct. at 2078, 219 L. Ed. 2d 721.

Recognizing they may be held accountable, and after a Purdue affiliate "pleaded guilty to a federal felony for misbranding OxyContin as 'less addictive' and 'less subject to abuse . . . than other pain medications[,]'" 603 U.S. at 210, 144 S. Ct. at 2078, 219 L. Ed. 2d 721 (quoting *In re Purdue Pharma L. P.*, 635 B.R. at 48), the Sackler family siphoned off "approximately $11 billion, draining Purdue's total assets by 75% and leaving it in a 'significantly weakened financial' state." 603 U.S. at 211, 144 S. Ct. at 2079, 219 L. Ed. 2d 721 (citing *Purdue*, 69 F.4th at 59-71). "Thousands of civil lawsuits followed as individuals, families, and governments within and outside the United States sought damages from Purdue and the Sacklers for injuries allegedly caused by their deceptive marketing practices." *Id.* (citing *Purdue*, 69 F.4th at 60). As the Supreme Court recognized, the claims were of a sort that could result in non-dischargeable

debts for fraud or willful and malicious injury. 603 U.S. at 222, 144 S. Ct. at 2085, 219 L. Ed. 2d

721 (citing §§ 523(a)(2), (4), (6)).

In the context of Purdue's Chapter 11 plan, the Sacklers sought an "injunction that would

not just prevent suits against the company's officers and directors but would run in favor of

hundreds, if not thousands, of Sackler family members and entities under their control." 603 U.S.

at 212, 144 S. Ct. at 2079, 219 L. Ed. 2d 721. The Sacklers "proposed to end all . . . lawsuits

without the consent of the opioid victims who brought them." *Id.* When creditors were polled on

the proposed plan, fewer than 20% eligible to participate did so, though most who did supported

the plan. *Id.* "But "[t]housands of opioid victims voted against the plan too, and many pleaded

with the bankruptcy court not to wipe out their claims against the Sacklers without their

consent." *Id.* (citing *Purdue*, 635 B.R. at 35).

After discussing the facts, the Supreme Court concluded that "the bankruptcy code does

not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11,

effectively seeks to discharge[[16]] claims against a nondebtor without the consent of affected

---

[16] In *Purdue*, the Sacklers sought to characterize the injunctive relief they sought as a "release" rather than a "discharge," which the Supreme Court described as "word games." 603 U.S. at 223, 144 S. Ct. at 2085-86, 219 L. Ed. 2d 721. Given the expansive relief the plan proponents sought — an "injunction that would not just prevent suits against the company's officers and directors but would run in favor of hundreds, if not thousands, of Sackler family members and entities under their control," 603 U.S. at 212, 144 S. Ct. at 2079, 219 L. Ed. 2d 721 (citing *Purdue*, 69 F.4th at 117-90), this characterization seems apt. But there is a substantial and, in this Court's view, a legally significant difference in what the plan proponents in *Purdue* sought and what the parties here, who notably include the Accident Plaintiffs, requested. Here, the Court is approving bar orders which enjoin any further claims against Progressive and Fortegra associated with a single accident that neither Progressive nor Fortegra caused. This cannot be characterized as a "discharge" under the Code as neither Progressive nor Fortegra are receiving a discharge of any obligation unrelated to the accident or under any other policy or endorsement issued to any other insured. No liability of either Progressive or Fortegra beyond that related to the accident and applicable policy or endorsement is affected. All other liabilities of Progressive and Fortegra remain intact and are not within the scope of the bar orders the Court is approving here. The narrowly tailored injunctive relief in this case should not be conflated with a discharge under the Code. *E.g.*, 11 U.S.C. § 727 (discharge), 11 U.S.C. § 524 (effect of discharge), 11 U.S.C. § 1192 (discharge); *see also MacArthur Co. v. Johns-Manville Corp.* ("*Manville I*"), 837 F.2d 89, 91 (2d Cir. 1988) (rejecting argument that injunctive orders constitute a de facto discharge and explaining the flaw in that reasoning is that injunctive orders do not offer "the

claimants." 603 U.S. at 227, 144 S. Ct. at 2088, 219 L. Ed. 2d 721. The Supreme Court

expressed its decision as a narrow one confined solely to the question presented — whether a

bankruptcy court "may effectively extend to *nondebtors* the benefits of a Chapter 11 discharge

usually reserved for *debtors*." 603 U.S. at 215, 144 S. Ct. at 2081, 219 L. Ed. 2d 721. Because

the plan proponents primarily relied upon, and the Second Circuit rested upon, § 1123(b)(6), 603

U.S. at 217, 144 S. Ct. at 2082, 219 L. Ed. 2d 721, the Supreme Court trained its focus there. 603

U.S. at 216 n.2, 144 S. Ct. at 2082 n.2, 219 L. Ed. 2d 721. In doing so, however, the Supreme

Court recognized an argument conceded by the injunction proponents that § 105(a) on its own

does not authorize nonconsensual third-party releases as § 105(a) only carries out actions

expressly set forth in the Code. *Id.* (citing *In Re Purdue Pharma L.P.*, 69 F.4th at 73). The

Supreme Court confined its discussion of § 105 to a footnote, quoted below:

> The Sacklers suggest that, if 11 U.S.C. § 1123(b) does not permit a bankruptcy
> court to release and enjoin claims against a nondebtor without the affected
> claimants' consent, §105(a) does. That provision allows a bankruptcy court to
> "issue any order, process, or judgment that is necessary or appropriate to carry out
> the provisions of" the bankruptcy code. As the Second Circuit recognized, however,
> "§ 105(a) alone cannot justify" the imposition of nonconsensual third-party releases
> because it serves only to "'carry out'" authorities expressly conferred elsewhere in
> the code. Purdue concedes this point, as do several other plan proponents.
> Necessarily, then, our focus trains on § 1123(b)(6).

*Id.* (internal citations omitted).

Turning to § 1123(b), the Supreme Court noted the statute supplies a list of things a

Chapter 11 plan may do.[17] 603 U.S. at 216, 144 S. Ct. at 2081-82, 219 L. Ed. 2d 721 The last

---

umbrella protection of a discharge in bankruptcy" and are instead limited to "suits against the settling
insurers that arise out of or relate to [the debtor's] insurance policies.").

[17] Section 1123(b) directs that a plan "may" do the following:

> (1) impair or leave unimpaired any class of claims, secured or unsecured,
> or of interests;

subsection, § 1123(b)(6), provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." The majority took issue with a broad interpretation of what could be accomplished using § 1123(b)(6), as advanced by the Sackler family and Purdue:

> As the plan proponents see it, paragraph (6) allows a debtor to include in its plan, and a court to order, *any* term not 'expressly forbid[den]' by the bankruptcy code as long as a bankruptcy judge deems it 'appropriate' and consistent with the broad 'purpose[s]' of bankruptcy. And because the code does not expressly forbid a non-consensual nondebtor discharge, the reasoning goes, the bankruptcy court was free to authorize one here after finding it an 'appropriate' provision.

603 U.S. at 217, 144 S. Ct. at 2082, 219 L. Ed. 2d 721 (internal citations omitted).

The majority identified a problem with such a broad interpretation of § 1123(b)(6). "Paragraph (6) is a catchall phrase tacked on at the end of a long and detailed list of specific directions. When faced with a catchall phrase like that, courts do not necessarily afford it the broadest possible construction it can bear." *Id.* (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512, 138 S. Ct. 1612, 1625, 200 L. Ed. 2d 889 (2018) (where "general term follows more specific terms in a list, the general term is usually understood to 'embrace only objects similar in

---

(2) . . . provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under [§ 365];
(3) provide for—
    (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
    (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;
(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and
(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

nature to those objects enumerated by the preceding specific words."' (quoting *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 115, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001))).

Another concern identified by the majority was that the requested injunction sought "to extinguish claims against the Sacklers (i.e., nondebtor third parties) that belong to their victims. And precisely nothing in § 1123(b) suggests those claims can be bargained away without the consent of those affected, as if the claims were somehow Purdue's own property." 603 U.S. at 220, 144 S. Ct. at 2084, 219 L. Ed. 2d 721. Accordingly, § 1123(b)(6) would not be broadly construed to enjoin the victims' claims without their consent.

## II.    APPLICATION OF *PURDUE* TO THE INSTANT CASE

Applying *Purdue* to the instant case, the Court determines that it does not prohibit the bar order sought in the Fortegra Sale Motion. *Purdue* did not address sales of estate property and did not involve injunctive relief necessary to a settlement involving estate property in a Chapter 7 case.

A.    *Purdue* does not impact a bankruptcy court's authority to approve a bar order when necessary to facilitate a sale of estate property pursuant to § 363(f)(4) and (5).

*Purdue* does not foreclose the relief sought in the Fortegra Sale Motion nor did it address sales of estate property. Section 363(f) expressly authorizes sales free and clear of any interest[18] if such interest is in bona fide dispute, § 363(f)(4), or if the holder of the interest could be

---

[18] An "expansive interpretation of the term 'interest in property' that can be cut off by a 'free and clear' order under Section 363(f) promotes [the general policy of the Bankruptcy Code] by, *inter alia,* maximizing the value of the assets that are being sold. *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 641 (N.D. Ala. 2016) (citing *Douglas v. Stamco*, 363 F. App'x 100, 102–03 (2d Cir. 2010) (a core aim of the Bankruptcy Code is to maximize the assets' value and thus the potential recovery to creditors, and forbidding sales of assets free and clear of interests after the sale is contrary to this core aim)). "[T]he Code's drafters understood the importance of maximizing a debtor's property value [and] . . . that it was necessary to permit the bankruptcy trustee to have the flexibility to arrange a quick sale." *Id.* A quick sale requires "that the disposition of competing interests in the property not usurp the sale." *Id.* Thus, selling the assets free and clear "is a critical component of a bankruptcy sale . . . ." *Id.*

compelled in a legal or equitable proceeding to accept a money satisfaction of such interest, § 363(f)(5). Here, the UST and the Chapter 7 Trustee stipulated that

> [t]he interest of all the enjoined parties and nonparties, persons and entities, to the extent that they are specifically identified in the Motions and the notices of hearing, in the Progressive Policy or the Fortegra Policy is subject to bona fide dispute as to whether any persons or entities may assert a valid claim under the Progressive Policy or the Fortegra Policy.

(Doc. No. 196 ¶ 22). They further stipulated that "[a]ny parties or nonparties claiming interest in the Progressive Policy or the Fortegra Policy could be compelled to accept a money satisfaction of such interest." (*Id.* ¶ 23). The record is devoid of evidence the Barred Third Parties have any claims or interests against either the Fortegra policy or Fortegra; the Court simply presumes they may merely due to the bar order request.

But the Barred Third Parties received sufficient notice that the sale was contingent upon a bar order precluding any future claims against Fortegra associated with the accident. (Doc. Nos. 130, 131, 140, 141.) They were on notice that their rights may be impacted but remained silent.[19] Because they failed to object[20] despite multiple opportunities (Doc. No. 196 ¶¶ 21, 22, 23, 36),

---

[19] Local Rule 2002-4 establishes the Court's negative notice procedure. The Rule sets forth the form of the negative notice legend, which cautions parties that if they "do not file a response within the time permitted, the *Court will consider that [they] do not oppose the relief requested* in the paper, and the Court may grant or deny the relief requested without further notice or hearing." Local Rule 2002-4(b)(2) (emphasis added). The Court provides a list of approximately 90 motions and applications that are permitted and encouraged to be filed using the negative notice procedure, including motions to approve a compromise or settlement in a Chapter 11 case. Negative Notice List, U.S. Bankr. Ct., Middle Dist. of Fla. (last revised June 28, 2021), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.flmb.uscourts.gov/negativenotice/list.pdf?rnd=1 (last visited May 19, 2025). In addition, Local Rule 2002-4 permits the Court to consider additional "motions, objections, and other matters" using the negative notice procedure. Local Rule 2002-4(a). "The practical effect of notice and orders is that the Court's ruling may become effective more quickly than noticing a motion for hearing, waiting through the notice time, holding the hearing, then issuing an order." *In re Haney*, No. 21-02007-TOM-13, 2022 WL 3364168, at *7 n.27 (Bankr. N.D. Ala. Aug. 12, 2022).

[20] Consent is not a requirement to a sale under either (f)(4) or (f)(5) of § 363, neither of which were at issue in *Purdue*. *See In re Williamsburg Boutique LLC*, 663 B.R. 217, 225 (Bankr. S.D.N.Y. 2024)

the Court does not agree with the UST's contention that the bar order is nonconsensual.[21] On these facts, the Court concludes the Fortegra policy may be sold free and clear of all claims and interests with the requested bar order.

The Court is not the first to determine bar orders are still permitted when necessary to a sale or settlement concerning property of the estate. At least three other bankruptcy courts concluded *Purdue* does not preclude them from entering injunctive relief in the form of a bar order when necessary to monetize a debtor's insurance policies. *In re Hopeman Bros., Inc.*, 667 B.R. 101, 106 (Bankr. E.D. Va. 2025) (recognizing that "injunctions and releases have long accompanied 'free and clear' sales in bankruptcy"); *In re Bird Global, Inc.*, No. 1:23-bk-20514-CLC (Bankr. S.D. Fla. Aug. 2, 2024) (approving bar order and channeling injunction related to insurance settlement agreements), *order den. emergency mot. stay confirmation order pending appeal,* No. 1:24-CV-23086-RAR, Doc. No. 35 (S.D. Fla. Aug. 21, 2024); *Roman Cath. Diocese of Rockville Ctr.*, 665 B.R. 71, 88 (Bankr. S.D.N.Y. 2024) (noting courts routinely approve injunctive relief as part of a free and clear sale pursuant to § 363(f) without an adversary proceeding and approving settlement agreement with releases and injunctions, overruling United States Trustee's objection that *Purdue* precludes such relief). As such, and because *Purdue* did not concern § 363 sales of estate property, the Court is confident *Purdue* does not foreclose entry

---

(approving sale of debtor's rights under an easement pursuant to § 363(f)(4) and (5) over the debtor's and grantor's objections).

[21] *Compare In re Roberts*, 249 B.R. 152, 155 (Bankr. W.D. Mich. 2000) (rejecting argument that "consent" and "failure to object" are synonymous in the context of § 362(f)(2), which expressly references consent) *with In re Borders Grp., Inc.,* 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) (failure to object is deemed consent to free and clear sale under § 363(f)(2)) *and TransUnion Risk & Alternative Data Sol., Inc. v. The Best One, Inc.* (*In re TFLO, LLC*), 572 B.R. 391, 435 (Bankr. S.D. Fla. 2016) (finding implied consent to free and clear sale by party who received notice and failed to object or attend hearing).

of a bar order when necessary to effectuate a sale of estate property free and clear of liens,

claims, and encumbrances as requested here.[22]

B. _Purdue_ does not impact a bankruptcy court's authority to approve injunctive relief in furtherance of a settlement involving estate property in a Chapter 7 case.

Unlike the Fortegra Sale Motion, the Progressive Settlement was not advanced as a § 363

sale.[23] Rather, approval of the settlement and bar order was sought pursuant to _Munford_, §

105(a), and Rule 9019. Based on the Supreme Court's acknowledgment in footnote 2 of _Purdue_

that "'§ 105(a) alone cannot justify' the imposition of nonconsensual third-party releases because

it serves only to 'carry out' authorities expressly conferred elsewhere in the code[,]"603 U.S. at

216 n.2, 144 S. Ct. at 2082 n.2, 219 L. Ed. 2d 721 (citing _In Re Purdue Pharma L.P._, 69 F.4th at

73), the UST argues the related bar order cannot be approved.

In seeking approval of the Progressive Settlement with a bar order, the parties cited to

only § 105(a) and no other relevant statute in the Code. This does not preclude the Court,

however, from recognizing that § 704(a) requires the Chapter 7 Trustee to monetize estate

property. And as the supervising authority,[24] the UST understands "[t]he primary role of a

Chapter 7 Trustee is to liquidate property for the benefit of unsecured creditors." _In re Steffen_,

426 B.R. 907, 914 (Bankr. M.D. Fla. 2010). Pursuant to § 704(a), a Chapter 7 "trustee shall—

collect and reduce to money the property of the estate for which such trustee serves and close

such estate as expeditiously as is compatible with the best interests of parties in interest . . . ." 11

U.S.C. § 704(a)(1).

---

[22] Fortegra also argued the buyback agreement could be approved under Rule 9019 and § 105(a). (Doc. No. 182 at 8-9.)

[23] During the hearing on February 26, 2025, the parties to the Progressive Settlement asked to rework the settlement as a § 363 sale if the Court determined _Purdue_ precludes approval of the bar order. The UST did not object to the request.

[24] Chapter 7 trustees are selected from a panel of private trustees established, maintained, and supervised by the United States Trustee. 28 U.S.C. § 586(a)(1).

A debtor's insurance policies are widely recognized as property of the debtor's estate.[25] Here, the Chapter 7 Trustee fulfilled his duty to monetize the Debtor's insurance policies and sought approval of the related settlements and compromises pursuant to *Munford,* § 105(a), and Rule 9019. As relevant, Rule 9019(a) authorizes the Court to approve a settlement if notice is provided to all creditors, the United States trustee, the debtor, and any other entity the Court designates. As the UST notes, Rule 9019 is procedural and cannot "abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. Rule 9019(a) does little beyond detailing who must receive notice of a compromise or settlement.

But § 105(a) expressly authorizes a bankruptcy court to "issue any order, process,[26] or judgment that is necessary or appropriate to carry out the provisions of" the Code. 11 U.S.C. § 105(a). In a Chapter 7 case, the operative provision is § 704(a), directing the Chapter 7 trustee to "reduce to money the property of the estate . . . ." And to do so, a Chapter 7 trustee may require injunctive relief available under § 105(a). Here, the Chapter 7 Trustee cannot fulfill his § 704(a) obligations absent resort to § 105(a). And when § 105(a) is used to facilitate the Chapter 7 trustee's duties expressly conferred in § 704(a), § 105(a) does not operate alone. A contrary interpretation undermines the Chapter 7 Trustee to the detriment of the very creditors the UST appointed the Chapter 7 Trustee to serve. If the requested bar orders are not provided, the Chapter 7 Trustee cannot monetize the Debtor's insurance policies, harming the interests of the Accident Plaintiffs advocating for this relief.

---

[25] *Ford Motor Credit Co. v. Stevens (In re Stevens)*, 130 F.3d 1027, 1029 (11th Cir. 1997) ("the truck and the insurance policy covering damage to the truck were property of the Debtors and, therefore, property of the . . . estate"); *In re Scott Wetzel Servs., Inc.*, 243 B.R. 802, 804 (Bankr. M.D. Fla. 1999) ("[T]he law is clear that an insurance policy issued to the debtor will generally constitute 'property of the estate . . . .'" (citing *Matter of Edgeworth*, 993 F.2d 51, 55 (5th Cir.1993)).

[26] Negative notice is the process authorized by Local Rule 2002-4 permitting the Court to proceed on certain motions with the assumption that the opposing party consents to the relief requested if that party fails to file a response to the motion within a certain time. *See supra* n.19.

But the UST argues the Chapter 7 Trustee "must point to some Code provision that permits chapter 7 debtors, but not chapter 11 debtors, to impose nonconsensual[27] releases of claims between non-debtors." (Doc. No. 160 ¶ 22.) The UST makes this argument because *Purdue* was a Chapter 11 case involving § 1123(b)(6), which does not apply in this Chapter 7 case. And based on the Supreme Court's determination that § 1123(b)(6) is a "catchall statute" and its related analysis, § 1123(b)(6) would never be adequate to support a bar order sought pursuant to § 105(a).

But the UST's argument overlooks the plain language of § 105(a) giving a bankruptcy court the power to enter "any order . . . ." The language "any order" is broad but reined in by the phrase "necessary and appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a). The Court cannot conceive of an order more necessary or appropriate than the limited protective orders sought here. Unlike § 1123(b)(6), § 704(a) is adequate to support entry of a bar order pursuant to § 105(a), which is the result the Accident Plaintiffs seek.

Because the Court concludes § 105(a) operates in tandem with § 704(a) and merits entry of the requested bar orders, to whatever extent § 105(a) requires a statutory pairing, it has one here, distinct from *Munford*. And based on the silence in response to repeated notice of the proposed bar orders, the Court cannot conclude they are nonconsensual – yet another distinction, since *Munford* approved a bar order over objections. Nevertheless, presuming there may be a difference of opinion on the Court's conclusions, the Court will address the UST's argument that *Munford* is implicitly overruled, while expressly noting that only the Supreme Court or the Eleventh Circuit en banc can truly answer that question. *See United States v. Isaac*, No. 522CR117LCBHNJ1, 2023 WL 1415597, at *3 (N.D. Ala. Jan. 31, 2023) ("As is true for any

---

[27] For the reasons stated earlier, the Court does not find the bar orders here are nonconsensual. *See* discussion *supra* Section II.A.

published Eleventh Circuit decision, this Court is powerless to overlook [that decision's] unequivocal instruction without subsequent direction from the Supreme Court (or the Eleventh Circuit en banc) either expressly overruling [that decision] or undermining it to the point of abrogation.").

## III.   DID *PURDUE* IMPLICITLY OVERRULE *MUNFORD?*

To determine whether *Purdue* implicitly overruled *Munford*, the Court first analyzes the Eleventh Circuit's legal standard for examining whether its prior panel precedent is overruled. The Court must then determine whether *Purdue* is both clearly on point and clearly contrary to *Munford*. Next, the Court considers what happens if, in the event of an appeal, the Eleventh Circuit concludes *Munford* is not implicitly overruled. Finally, the Court reviews whether the instant case is distinguishable from *Purdue*.

### A.   Analysis of Eleventh Circuit's legal standard for examining whether its prior panel precedent is overruled.

To expressly abrogate or directly overrule precedential appellate court authority, a Supreme Court's "decision must have 'actually overruled or conflicted with'" the prior precedent of an Eleventh Circuit panel. *United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008) (quoting *United States v. Marte*, 356 F.3d 1336, 1344 (11th Cir. 2004)). "Even if the reasoning of an intervening [Supreme Court] decision is at odds with a prior appellate court decision, that does not provide the appellate court with a basis for departing from its prior decision." *Id.* (citing *Atl. Sounding Co. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007)). Rather, a circuit court, and all lower courts bound by the circuit precedent, will adhere to that precedent unless and until it is overruled by the circuit that issued the precedent en banc or by the Supreme Court. *See id.* at 1238.

The UST does not suggest that *Munford* was expressly abrogated or directly overruled. Instead, the UST argues *Purdue* undermined *Munford* to the point of abrogation. "'For a Supreme Court decision to undermine panel precedent to the point of abrogation, the "decision must be clearly on point" and "*clearly contrary*" to the panel precedent.'" *United States v. Lightsey*, 120 F.4th 851, 860 (11th Cir. 2024) (quoting *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 743 (11th Cir. 2024) (emphasis in original)). Unless the Eleventh Circuit can distinguish the facts or law of the case under consideration from its prior precedent, it must follow the reasoning behind the prior holding. *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1227 (11th Cir. 2018); *Singleton v. City of Montgomery*, No. 23-11163, 2025 WL 1042101, at *4 (11th Cir. Apr. 8, 2025). A Supreme Court case that is not "squarely on point" and "merely weaken[s]" a prior panel's holding does not merit a departure from the prior panel precedent. *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009). If the Supreme Court never discussed a panel's prior precedent and did not comment on the precise issue before the prior panel, the precedent remains binding. *Vega-Castillo*, 540 F.3d at 1238; *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1230 (11th Cir. 2007) ("Obedience to a Supreme Court decision is one thing, extrapolating from its implications a holding on an issue that was not before that Court in order to upend settled circuit law is another thing.").

B.  Is *Purdue* "clearly on point" and "clearly contrary" to *Munford*?

Under the standard set forth by the Eleventh Circuit, evaluating the UST's implicit abrogation argument requires an analysis of whether *Purdue* is clearly on point and clearly contrary to *Munford*. The "clearly on point and clearly contrary" criteria are conjunctive; absent both, courts in the Eleventh Circuit may not disregard *Munford*. *Kaley*, 579 F.3d at 1255 ("*In addition to being squarely on point*, the doctrine of adherence to prior precedent also mandates

that the intervening Supreme Court case *actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel*." (Emphasis added.)). The analysis is complicated because the language relied upon by the UST for the proposition that *Munford* is implicitly overruled (thus "clearly on point and clearly contrary" to *Purdue*) appeared only in a footnote containing no independent analysis from the Supreme Court.

Certainly, the Supreme Court's comments confirm § 105(a) alone cannot justify a nonconsensual third-party release. After all, the Supreme Court accepted the case "to resolve a longstanding and deeply entrenched disagreement between lower courts over the legality of nonconsensual third-party releases." *Purdue*, 603 U.S. at 224 n.6, 144 S. Ct. at 2086 n.6, 219 L. Ed. 2d 721. So, the Supreme Court's statement about why it accepted the case is broad. But the Supreme Court's actual holding – that "the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants" – is not. *Purdue*, 603 U.S. at 227, 144 S. Ct. at 2088, 219 L. Ed. 2d 721. This holding is far narrower than the stated reason for accepting certiorari to begin with and is limited to the Chapter 11 plan context. And the Supreme Court stated it was confining itself to the question presented, *id.*, which did not reference § 105(a).

Regardless, the Court is very mindful of the Supreme Court's conclusion that § 105(a) alone cannot support a nonconsensual third-party release. To the extent *Munford* can be said to stand for this proposition, it appears to be "clearly contrary" to *Purdue*. But questions remain. Might § 105(a) be singularly relied upon to support a *consensual* third-party release? Or must it always be paired with another statute? And what constitutes consent? The Supreme Court

expressly declined to weigh in. *Purdue*, 603 U.S. at 226, 144 S. Ct. at 2088, 219 L. Ed. 2d 721

(stating the Court does not "express a view on what qualifies as a consensual release . . . .").

    The more difficult analysis[28] concerns whether *Purdue* is clearly on point, necessitating a

factual comparison. And of course, the facts in *Purdue* and in *Munford* are nothing alike. In

*Purdue*, at issue was a plan that contained a nonconsensual "injunction that would not just

prevent suits against [Purdue's] officers and directors but would run in favor of hundreds, if not

thousands, of Sackler family members and entities under their control." *Purdue*, 603 U.S. at 212,

144 S. Ct. at 2079, 219 L. Ed. 2d 721. The proposed injunction was so broad the Supreme Court

repeatedly characterized it as a discharge, pointedly noting the nondischargeable nature of the

claims at issue, and that the injunction would run in favor of those who aided in perpetuating the

harm. The Supreme Court extensively analyzed § 1123(b)(6) and explained the limits on its

construction.

    None of this discussion seems clearly on point to *Munford*, in which § 1123(b)(6) was not

at issue, nor did the injunction bar nondischargeable claims. In *Munford*, the Eleventh Circuit

simply affirmed a decision to approve a settlement conditioned upon a bar order enjoining claims

for contribution and indemnity where the bankruptcy court concluded the interests of those

enjoined were sufficiently protected and that it had subject matter jurisdiction to do so. Because

---

[28] The analysis is also daunting. On one hand, in *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006), the Eleventh Circuit explained it "would never occur to us to tell the Supreme Court that we would decide our cases based on our analysis of its decisions, not its own analysis of them if that analysis had been announced in a case where it was not essential to the result." Here, it is clear the Supreme Court concluded § 105(a) cannot be relied upon alone to impose a nonconsensual nondebtor release, though this conclusion was not essential to the result because the parties below had conceded the argument. Because the argument was conceded, no analysis was announced. On the other hand, the Eleventh Circuit has expressed a reluctance to extrapolate from the implications of a Supreme Court holding on an issue that was not before that Court in a way that upends longstanding circuit precedent. *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d at 1230.

the Supreme Court cabined its decision in *Purdue* solely to the question presented, which arose in a Chapter 11 plan scenario involving entirely different facts, the Court is uncertain as to whether the Eleventh Circuit sitting en banc would extend *Purdue's* application to *Munford* when doing so would upend its prior precedent.

Indeed, the Eleventh Circuit has recognized the authority of bankruptcy and other courts to approve bar orders when integral to a settlement for decades. *Apps v. Morrison (In re Superior Homes & Invs., LLC)*, 521 F. App'x 895, 898 (11th Cir. 2013) (affirming district court's affirmance of bankruptcy court order approving Rule 9019 settlement with a bar order enjoining creditors' state court litigation against non-debtor defendants in exchange for non-debtor defendants' $800,000 payment to the estate; bar order was essential to protect against further costs of litigation and to preserve the settlement funds for the estate's benefit); *Markland, LLC v. Leyva Capital (In re Centro Grp., LLC)*, No. 21-11364, 2021 WL 5158001, at *3 (11th Cir. 2021) (bar order is appropriate and integral to a settlement where the parties would not enter into a settlement agreement without it; bar order's purpose "is not to ensure success for a reorganized entity by eliminating liability against third parties but is instead to facilitate a settlement agreement."); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 496 (11th Cir. 1992) (district court may issue a settlement bar order concerning claims for indemnity and contribution against a nonsettling defendant after it makes a reasoned determination that it is fair and equitable to do so.) Because *Purdue* does not seem clearly on point, the Court does not share the UST's confidence that the Eleventh Circuit would necessarily conclude that the Supreme Court's footnote acknowledgement of a conceded argument serves to obliterate decades of longstanding precedent.

C.   <u>What happens if, in the event of an appeal, the Eleventh Circuit concludes *Munford* is not implicitly overruled?</u>

The UST hypothesizes that if *Purdue* is not construed to implicitly overrule *Munford* and *Purdue* had been filed in the Eleventh Circuit, it could have led to approval of a bar order under § 105(a) and Rule 9019, yielding an undesirable inconsistency among circuits given *Purdue's* conclusion that § 105(a) alone does not suffice. The Court notes again that the expressly stated reason the Supreme Court accepted certiorari was "to resolve a longstanding and deeply entrenched disagreement between lower courts over the legality of nonconsensual third-party releases." *Purdue*, 603 U.S. at 224 n.6, 144 S. Ct. at 2086 n.6, 219 L. Ed. 2d 721. But the ultimate ruling seems far narrower than the Supreme Court's articulated goal. And the Court does not agree that a bar order would necessarily be approved in the Eleventh Circuit under the present facts in *Purdue* if, for some reason, the case had been filed here. The Supreme Court emphasized that the proposed relief in *Purdue* equated to a discharge of vast and widespread liability of a type that would be deemed nondischargeable under the Code, establishing a pathway for non-debtor tortfeasors to evade liability without filing for bankruptcy and complying with the Code's obligations. The expansive injunctive relief is far from a slam dunk.

D.   <u>The instant case is easily distinguished from *Purdue*.</u>

Finally, critical distinctions between this case and *Purdue* should also not be overlooked. Unlike § 1123(b)(6), neither § 105(a) nor § 704(a) are "catchall" provisions tacked on to the end of statutory lists. These statutes are also dissimilar; § 1123(b) provides for what a *plan may* do and obviously has no application in Chapter 7 cases, but § 105(a) provides for what a *court may* do. And § 704(a) directs what a *Chapter 7 trustee must* do. In addition, unlike what can be said of many of the would-be beneficiaries of the injunctive relief in *Purdue*, Progressive and Fortegra had no culpability or involvement in the cause of the harm here. They are not

tortfeasors seeking to avoid liability for widespread addiction and death caused by their actions

and product. They are simply insurance companies looking to buy their peace and resolve the

issues involving them. Progressive and Fortegra are entitled to an assurance of protection from

claims related to the accident in exchange for their significant financial contributions that

directly benefit those who were harmed by the acts of others when the *Justice Oaks* factors merit

this result. *In re S & I Invs.*, 421 B.R. 569, 585 (Bankr. S.D. Fla. 2009) ("'Defendants buy little

peace through settlement unless they are assured that they will be protected . . . .'" (quoting *In re*

*U.S. Oil & Gas Litig.*, 967 F.2d at 494)). And unlike *Purdue*, here nobody (other than the UST)

objected to the proposed bar orders. Further contrasting this case from *Purdue*, where there are

thousands upon thousands of victims, many unknown, here we have a relatively small, finite

group of creditors with claims resulting from a tragic accident, all of whom support the requested

bar orders, and whose recovery is being delayed. The facts and circumstances in this case are not

in the same realm as the shocking, widespread, knowing, and prolonged wrongdoing present in

*Purdue*. The concern in *Purdue* that a favorable Sackler ruling may supply a roadmap for

tortfeasors to misuse the bankruptcy system, *Purdue*, 603 U.S. at 226, 144 S. Ct. at 2087, 219 L.

Ed. 2d 721, is simply not present.

## IV.    CONCLUSION

The UST fails to convince the Court that *Purdue* implicitly overruled *Munford*. Even if it

did, however, *Purdue* is so distinguishable from the instant case that it does not preclude the bar

orders at issue here. A bar order protecting Fortegra is necessary to the sale of the Fortegra

policy under § 363(f)(4) and (5) and is an appropriate use of the Court's powers pursuant to §

105(a), as is the bar order protecting Progressive when § 105(a) operates in tandem with §

704(a). The UST's objections are overruled, the Progressive Settlement (Doc. No. 129) is

approved, and the Fortegra Sale Motion (Doc. No. 182) is granted.

**###**

C. Andrew Roy is directed to serve a copy of this Memorandum Opinion on interested parties
who are non-CM/ECF users and file a certificate of notice within 3 days of entry of the order.